[No. H022025. Sixth Dist. May 17, 2002.]

PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC., et al.,
Petitioners, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
MICHELLE L. DUNNIWAY, Real Party in Interest.

586

**COUNSEL**

Beckman, Davis, Smith & Ruddy, Jeffrey P. Smith and Cheryl A. De Bari for Petitioners.

No appearance for Respondent.

Bailey & Kornblum, Guy Kornblum & Associates, Guy O. Kornblum and Walter G. Crump for Real Party in Interest.

**OPINION**

**WUNDERLICH, J.—**

## I. INTRODUCTION

In this insurance coverage action, defendants Prudential Insurance Company of America and Prudential Health Care Plan of California, Inc.[1] petition for extraordinary relief from the order of respondent court denying their motion for summary judgment. To determine whether extraordinary relief is warranted, we consider an issue of first impression in California insurance law concerning the interpretation of the phrase "enrolled as a full-time student in a school" in a group health policy that provides medical coverage to employees' dependents aged 19 to 24 who meet that description. The courts of other jurisdictions have determined that the plain meaning of the word "enrolled" is that the dependent is registered at an academic institution, and that the phrase "full-time student" plainly means that the dependent spends a substantial amount of time attending classes. We find these decisions persuasive. Therefore, because it is undisputed that at the time of her catastrophic accident in November 1994 plaintiff Michelle L. Dunniway was not registered at an academic institution and was not attending any classes, as a matter of law she did not qualify for dependents medical coverage under defendants' group health policy. Defendants therefore have no obligation to provide her with lifetime medical coverage for her

---

[1]Hereafter, petitioners Prudential Insurance Company of American, Inc., and Prudential Health Care Plan of California, Inc., are referred to collectively as Prudential or defendants.

accident-related medical expenses. Accordingly, we will grant extraordinary relief as requested and issue a writ of mandate directing respondent court to grant defendants' motion for summary judgment.

## II. Factual and Procedural Background

### A. *The Prudential Group Health Policy*

Michelle's father William Dunniway (William) was an employee of the Mt. Hermon Association.[2] From September 1, 1993, to September 1, 1995, the employees of the Mt. Hermon Association had medical coverage under a Prudential Health Care Group Contract (the Plan). The Plan provides medical coverage for "qualified dependents," who include employees' unmarried children under the age of 19. Additionally, the Plan provides qualified dependents coverage to children aged 19 to 24 if certain eligibility requirements are met: "(1) The age 19 limit does not apply to a child who: [¶] (a) is wholly dependent on you [the employee] for support and maintenance; and [¶] (b) is enrolled as a full-time student in a school; and [¶] (c) is less than the Student Age Limit. [¶] Student Age Limit: 25."

The Plan requires the employee to notify the employer "promptly" when "a Qualified Dependent becomes ineligible." Additionally, the Plan states, "Your Dependents Coverage for a Qualified Dependent will end when that person: (1) moves his or her permanent address outside the Service Area; or (2) ceases to be a Qualified Dependent." The Plan also includes options for the continuation of medical coverage when coverage under the Plan ends, including group health care continuation (under COBRA[3]), extension of group health care protection (for disabled persons), and a conversion privilege (for an individual health care coverage contract).

To obtain qualified dependents coverage for Michelle, William submitted to Prudential an overage dependent student verification form stating that Michelle was a full-time student at the University of California, Santa Barbara (UCSB) as of August 12, 1993. Michelle's qualified dependents coverage became effective on September 1, 1993.

### B. *Michelle's Student Status at UCSB*

The following facts appear to be undisputed. Michelle attended UCSB as a freshman during the 1993-1994 school year. For a variety of personal

---

[2]For purposes of clarity, throughout this opinion the members of the Dunniway family are referred to by their first names.

[3]The Consolidated Omnibus Budget Reconciliation Act of 1985, 29 United States Code sections 1161-1167; 42 United States Code sections 300bb-1 through 300bb-8, hereafter referred to as COBRA.

reasons, her freshman year did not go well and her grade point average fell below UCSB's required minimum. In a letter dated June 23, 1994, the acting dean of undergraduate studies advised Michelle that she was "subject to academic disqualification" and was "not eligible to continue at UCSB" unless she was "reinstated to the college." The acting dean further advised Michelle that she could not be reinstated unless she submitted a written appeal. Michelle did so. In a letter dated August 22, 1994, UCSB advised Michelle that her appeal had been reviewed and that she had been "reinstated on probation for the Fall 1994 quarter." The letter also states, "If you prefer to delay your return to UCSB for one or more quarters, you should file a Notice of Intent to Cancel Registration with the Office of the Registrar and you should not pay your fees for fall. When you feel ready to resume your studies here, you must file an application for readmission and reinstatement after absence with the Office of the Registrar several months before your planned return. We will examine your record and your new appeal at that time and, in the absence of any negative factors, we will reinstate you on probation."

In response to the letter of August 22, 1994, Michelle filed a notice of intent to cancel registration. The notice stated, "I am notifying the Office of the Registrar that I will not be returning for Fall quarter." In an accompanying letter Michelle wrote, "I need to take a quarter break to tend to personal problems and work full time for money for tuition." In another letter to UCSB, dated September 20, 1994, Michelle stated, "I am requesting that my records and status here at UCSB be put on hold and that I will be able to return and appeal for reinstatement. I also would like the proper application for readmission at Winter of 1995." According to Michelle's mother, Crystal Dunniway, Michelle made the decision to take fall quarter off on the advice of her college counselor.

On October 4, 1994, UCSB entered Michelle's cancellation of registration into its official records. Michelle did not attend any classes during fall quarter 1994. Unfortunately, Michelle never returned to college. On November 11, 1994, she sustained catastrophic injuries in an automobile accident. Michelle is now a totally disabled quadriplegic with brain damage and a claim for ongoing medical expenses in excess of $50,000 per year for the rest of her life.

## C. Prudential's Termination of Michelle's Qualified Dependents Coverage

On October 18, 1994, prior to Michelle's accident, Prudential terminated Michelle's coverage as a qualified dependent effective October 30, 1994.

According to Prudential, Michelle's coverage was terminated because William failed to return the overage student verification form which Prudential had sent to him in August 1994. William and Crystal deny ever receiving the August 1994 overage student verification form. They assert that they did not know that Michelle's coverage had been terminated until after her accident in November 1994.

To obtain medical coverage for Michelle after her catastrophic accident, William elected continuation coverage under COBRA. COBRA is federal legislation mandating that certain employees and their dependents be offered the option of paying premiums to continue medical coverage for a limited time period after the termination of coverage under a group health plan. (29 U.S.C. §§ 1161-1167; 42 U.S.C. §§ 300bb-1 through 300bb-8.) Prudential provided COBRA continuation coverage to Michelle retroactive to November 1, 1994. When William's employer switched its group health coverage from Prudential to Lifeguard in August 1995, Prudential's obligation to provide COBRA coverage ceased. However, Prudential provided Michelle with an additional 12 months of medical coverage pursuant to the Plan's provision for extension of group health care protection to disabled persons. Michelle has not received any medical coverage benefits from Prudential since the extended coverage ended on August 31, 1996.

D. *The Action Against Prudential*

Through her mother and guardian ad litem Crystal, Michelle filed an insurance coverage action against defendants Prudential, Lifeguard Insurance Company and Lifeguard, Inc. (collectively Lifeguard).[4] The currently operative pleading is the first amended complaint. In the complaint, Michelle alleges that all premiums owed to Prudential for her medical coverage have been paid and that she was covered as a dependent insured on the date of her accident. Michelle also alleges that Prudential has refused to pay any of her ongoing accident-related medical expenses. Further, Michelle asserts that Prudential has failed to properly investigate or process her claim and has refused to respond to her parents' inquiries.

The complaint includes causes of action for breach of contract, declaratory relief, and breach of the covenant of good faith and fair dealing. As remedies, the complaint seeks unpaid benefits, a declaration that defendants have an obligation to pay Michelle's ongoing medical expenses, attorney fees, general damages for emotional distress, and punitive damages.

---

[4]The Lifeguard defendants are not parties to these original proceedings.

### E. *Prudential's Motion for Summary Judgment*

Prudential filed a motion for summary judgment, or, in the alternative, summary adjudication on grounds that each cause of action in the complaint lacked merit as a matter of law. First, Prudential argued that it has not breached the insurance contract because the undisputed facts showed that Michelle has received all medical benefits under the Plan to which she was entitled after her eligibility for qualified dependents coverage ended, including COBRA continuation coverage and 12 months of extended coverage. Prudential further contended that it had no obligation to provide Michelle with lifetime coverage for her accident-related medical expenses, because the Plan did not provide coverage for medical services received after the Plan ended. Alternatively, Prudential argued that Michelle was not covered as a qualified dependent on the date of her accident because she was not a full-time student enrolled in a school, and therefore her right to coverage had not vested such that Prudential had an obligation to provide her with lifetime coverage for medical expenses related to her accident injuries. Prudential's contention that Michelle was not a full-time student enrolled in a school was based on UCSB records which showed that as of the date of the accident, November 11, 1994, Michelle had canceled her registration, was not attending classes at UCSB, and could not return to UCSB without reapplying for admission and having her application accepted by UCSB.

Second, Prudential asserted that because it had not breached the insurance contract, as a matter of law it could not be held liable for either the derivative claim of breach of the covenant of good faith and fair dealing or an award of punitive damages. Alternatively, Prudential argued that it had no liability because it was not a party to the insurance contract. Prudential asserted that an entity not named as a defendant, Prudential Healthcare, actually had issued the Plan.

### F. *Plaintiff's Opposition to the Motion for Summary Judgment*

In her opposition to Prudential's motion for summary judgment, Michelle argued that triable questions of fact precluded summary adjudication of any cause of action. Regarding the first cause of action for breach of contract, Michelle contended that Prudential had a contractual obligation to provide her with "continuous lifetime care" because she was covered under the Plan as a qualified dependent on the date of her accident. Since Prudential had denied medical benefits to Michelle as of September 1, 1996, Michelle asserted that Prudential had breached the contract.

In making this argument, Michelle disputed Prudential's factual assertion that at the time of the accident she was not a full-time student who was

eligible for qualified dependents coverage. According to plaintiff's separate statement of facts, "[a]t the time of her accident, Michelle was on approved leave and remained in 'good standing' with the University. She had followed the necessary procedures to take time off from her classes and still preserve a spot in the upcoming Winter Quarter, and could return to her classes in the Winter Quarter without reapplying for admission to UCSB." As evidentiary support for this fact, Michelle cited the declaration of Virginia Johns, UCSB associate registrar. Moreover, Michelle also asserted that UCSB's policies and procedures established that a student could take approved leave or withdraw for a quarter while remaining in good standing, and could resume classes the following quarter without reapplying for admission.

Michelle further argued that Prudential had denied her claim for lifetime medical benefits due to the size of her claim, based on Prudential's provision of medical benefits to other dependents who were not attending classes. According to Michelle, Prudential's internal documents and the testimony of a Prudential representative showed that Prudential customarily provided qualified dependents coverage to those dependents who were considered to be in good standing by their academic institutions, without regard to whether the dependent was enrolled or attending classes.

Additionally, Michelle argued that triable questions of fact existed with regard to whether Prudential properly canceled her coverage prior to her accident. She asserted that Prudential had failed to provide Michelle's parents with written notice of cancellation and had also failed to follow its own policy of not canceling an unqualified dependent's coverage until the dependent's birthday. Also, Michelle noted that Prudential had accepted a premium payment for her qualified dependent's coverage in November 1994 and did not reimburse the premium until after her accident.

As to the second cause of action for breach of the covenant of good faith and fair dealing, Michelle argued that triable questions of fact existed as to whether Prudential demonstrated bad faith by unreasonably denying benefits, using inadequate notification policies, failing to investigate her claim, and failing to follow its internal procedures with respect to covering dependents who are college students. These triable questions of fact also preclude a summary adjudication of her claim for punitive damages, Michelle argued.

Finally, Michelle asserted that defendant Prudential Insurance Company of America, Inc., was a proper party defendant because it had authority to negotiate and approve contract amendments to the Plan.

## G. *The Trial Court's Order*

The trial court denied Prudential's motion for summary judgment. The court reasoned as follows: "As to whether Plaintiff was a 'Qualified Dependent', the Court finds that there is a triable issue of material fact (see [Code Civ. Proc., § 437c subd. (g)[5]]) as to whether Plaintiff was 'enrolled as a full time student,' as that term is used to determine if a dependent is insured under the health insurance policy at issue in this case. There is a triable issue whether Plaintiff had a reasonable expectation of continued coverage. (See the Johns' [*sic*] Declaration and Plaintiff's Separate Statement, paragraphs 4-11, 33-56.) [¶] The court further finds that the Prudential Defendants have failed to sustain their burden that they have paid all benefits to which Plaintiff is entitled (the 'full payment theory'); under *Fields v. Blue Shield of California* (1985) 163 Cal.App.3d 570 [209 Cal.Rptr. 781], Plaintiff has vested lifetime benefits (if she is found to be a 'Qualified Dependent')."

The trial court denied the motion for summary adjudication of the first cause of action for breach of contract and the second cause of action for declaratory relief for the same reasons. As to the third cause of action for breach of the covenant of good faith and fair dealing, the court denied summary adjudication on the ground that "Moving parties' Separate Statement does not show that they acted reasonably as a matter of law; thus the Defendants failed to carry their burden on this motion."

## III. DISCUSSION

After the trial court denied its motion for summary judgment, Prudential filed a petition for a writ of mandate directing the trial court to vacate its order and enter a new order granting the motion. We issued an alternative writ and a temporary stay of all trial court proceedings while the writ petition was pending.

## A. *Availability of Writ Relief and the Standard of Review*

■ An order denying a motion for summary judgment may be reviewed by way of a petition for a writ of mandate. (§ 437c, subd. (*l*).) Where the trial court's denial of a motion for summary judgment will result in a trial on nonactionable claims, a writ of mandate will issue. (*Lompoc Unified School Dist. v. Superior Court* (1993) 20 Cal.App.4th 1688, 1692 [26 Cal.Rptr.2d 122].) ■ Since a motion for summary judgment "involves pure matters of law," we review a ruling on the motion independently. (*Aguilar v. Atlantic*

---

[5]Further statutory references are to the Code of Civil Procedure unless otherwise noted.

*Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].) ■ Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).) A defendant making the motion has the initial burden of showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (§ 437c, subd. (*o*)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.) If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue. In meeting this obligation, the plaintiff may not rely on the mere allegations of its pleadings, but must "set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (§ 437c, subd. (*o*)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 849.)

■ With regard to the interpretation of insurance policies, the reviewing court "makes an independent determination of the policy's meaning" unless "such interpretation turned upon the credibility of conflicting extrinsic evidence." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶ 4:3, p. 4-1; *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].) Applying the independent standard of review, we review the moving and opposing papers and supporting evidence to determine whether Prudential is entitled to summary judgment because the material undisputed facts show that Prudential has met its contractual obligation to provide all medical benefits that Michelle is entitled to receive under the Plan, and therefore all causes of action in Michelle's complaint lack merit as a matter of law.

## B. *Prudential Is Entitled to Summary Judgment*

The crux of Michelle's complaint is her claim that Prudential is obligated under the Plan to provide coverage for her accident-related medical expenses for the rest of her life. Because Prudential ceased payment of Michelle's medical expenses after August 31, 1996, and has denied her claim for lifetime benefits, Michelle contends that Prudential has breached both the insurance contract set forth in the Plan and the covenant of good faith and fair dealing, in a manner sufficiently egregious to justify an award of punitive damages. Michelle's claim for lifetime benefits is based upon the concept of insurance coverage vesting, as discussed in *Fields v. Blue Shield of California, supra,* 163 Cal.App.3d 570.

1. *The Concept of Insurance Coverage Vesting*

*Fields v. Blue Shield of California, supra,* 163 Cal.App.3d 570, is one of the few California decisions to address the concept of insurance coverage vesting in the context of a group health policy. The facts in *Fields v. Blue Shield of California* involve a claim of lifetime coverage for psychoanalysis. Plaintiff Fields sued Blue Shield after Blue Shield refused to pay for Fields's psychoanalysis, which Fields had undergone as part of his training to become a psychoanalyst. Fields argued that Blue Shield's group health insurance plan provided him with lifetime maximum benefits of $50,000 for psychoanalysis, as the plan had originally stated at the time of his enrollment. Although Blue Shield later modified the plan to eliminate coverage for psychoanalysis obtained in furtherance of training, Fields asserted that the modification did not eliminate his coverage because his right to coverage had vested. The appellate court agreed with Fields, ruling, "once liability has attached under a group policy—that is, after the happening of the event insured against—cancellation or modification of the master policy is ineffective to preclude recovery by the employee, or his beneficiary as provided by the original policy." (*Fields v. Blue Shield of California, supra,* 163 Cal.App.3d at pp. 585-586, quoting Annot., Cancellation or Modification of Master Policy as Termination of Coverage Under Group Policy (1959) 68 A.L.R.2d 249, § 17, pp. 278-279, italics omitted.) Because Blue Shield had provided Fields with coverage for psychoanalysis in furtherance of training prior to modifying the policy to eliminate such coverage, the court concluded that Fields "had a vested right" to coverage from Blue Shield until the lifetime maximum benefits of $50,000 were exhausted. (*Fields v. Blue Shield of California, supra,* 163 Cal.App.3d at p. 588.)

Michelle contends that, like Fields, her right to lifetime medical benefits has vested. She argues that the Plan is ambiguous as to the insured's right, after the policy terminates, to receive benefits for posttermination expenses incurred for pretermination injuries, and that such ambiguity must be construed against the insurer to allow vesting. For that reason, Michelle contends that the trial court correctly determined that her right to lifetime medical coverage became vested at the time of her accident if she is found to be qualified dependent. Since, in Michelle's view, her evidence shows that she was a qualified dependent, she asserts that Prudential has an obligation to provide coverage for her accident-related medical expenses for the rest of her life. At a minimum, Michelle argues, her evidence creates triable questions of fact as to whether she was a qualified dependent which preclude the granting of Prudential's motion for summary judgment.

Prudential rejects Michelle's claim to vesting on the ground that the Plan does not contain any express provisions for lifetime medical benefits. To the

contrary, Prudential insists that the Plan's language expressly provides that dependents coverage ends when the group contract ends or when the dependent ceases to be a qualified dependent. Posttermination benefits, according to Prudential, are limited to those benefits provided by the Plan's provisions for COBRA continuation coverage, extension of group health care protection, and the conversion privilege for individual health care contracts. Prudential relies upon the decision in *Fraker v. Sentry Life Ins. Co.* (1993) 19 Cal.App.4th 276 [23 Cal.Rptr.2d 372], in which the court ruled that a claim for posttermination benefits (i.e., coverage for medical expenses incurred after termination of a group health policy) was resolved by reference to the policy language. "We look first at *what event* was insured according to the language of the instant policy. If the relevant event was the inception of a disease or condition by [the claimant] during the life of the policy, this may give rise to [the insurer's] posttermination liability. If [the claimant's] incurrence of medical expenses during the policy period was the relevant event, then this creates only pretermination liability for [the insurer]." (*Id.* at p. 282.) Thus, "if the subject policy expressly provides for termination of coverage . . . or for posttermination benefits under strictly limited conditions, no vesting of benefits has been found." (*Ibid.*; see also *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722, 734-735 [85 Cal.Rptr.2d 497].) Prudential contends that the Plan falls into this category, since the policy language provides that posttermination benefits are limited to COBRA continuation coverage, extended benefits coverage for disability, and the conversion privilege for individual health care contracts.

However, we need not determine whether the language of the Plan may be interpreted to provide for the vesting of a right to lifetime medical benefits, or, indeed, whether the "concept of vesting should apply at all to health insurance contracts."[6] (*Fraker v. Sentry Life Ins. Co., supra,* 19 Cal.App.4th at p. 281.) A single threshold issue is determinative of

[6]Michelle also asserts an alternative theory of vesting, based upon her contention that Prudential's acceptance of a premium payment for her coverage in November 1994 gave her a vested interest in the policy (pursuant to *Lindgren v. Metropolitan Life Insurance Company* (1965) 57 Ill.App.2d 315 [206 N.E.2d. 734]) as well as a reasonable expectation that she would enjoy coverage in that month. At oral argument, Michelle argued for the first time that Prudential was estopped from denying coverage because it had accepted a premium payment for November 1994. Prudential responds that it generated the premium bill in advance, in October 1994, and promptly credited the premium payment back in the next monthly billing. Prudential also denies that acceptance of a premium in advance has the effect of extending coverage when the insured is no longer eligible. Under the circumstances of this case, we agree. Where, as here, the group health policy provides that coverage ceases automatically when the insured no longer meets the eligibility criteria, and a future premium was automatically collected and then returned, coverage is not extended. (See *Daniels v. Equitable Life Assurance Society* (1981) 123 Cal.App.3d 467, 476 [176 Cal.Rptr. 670, 32 A.L.R.4th 1028].) The decision in *Lindgren v. Metropolitan Life Insurance Company, supra,* 206 N.E.2d. 734, is

Michelle's claim. As the trial court correctly reasoned, Michelle's right to vesting depends upon an initial finding that she was insured under the Plan as a qualified dependent on the date of her accident. Regardless of the policy language, vesting cannot occur unless the claimant was insured under the policy at the time of illness or injury. (See *Fields v. Blue Shield of California, supra,* 163 Cal.App.3d at pp. 585-588; *Oklahoma State & Educ. Emp. v. Fullerton* (Okla.Civ.App. 1993) 852 P.2d 813, 814 [rights of full-time student dependent under group health plan vested when accident occurred during policy period].)

Therefore, to determine whether Prudential's motion for summary judgment should be granted, we must consider the threshold issue of whether the undisputed facts show that Michelle was not insured under the Plan as a qualified dependent on the date of her accident. This determination requires interpretation of the Plan's provision for qualified dependents coverage.

2. *The Principles of Insurance Policy Interpretation*

The Plan's provision for qualified dependents coverage states, "(1) The age 19 limit does not apply to a child who: [¶] (a) is wholly dependent on you [the employee] for support and maintenance; and [¶] (b) is enrolled as a full-time student in a school; and [¶] (c) is less than the Student Age Limit. [¶] Student Age Limit: 25." Since it is undisputed that Michelle met the eligibility requirements of falling within the 19 to 24 age group and being wholly dependent upon William for support and maintenance, the question is whether Michelle was also "enrolled as a full-time student in a school" at the time of her accident. The phrase "enrolled as a full-time student in a school" is not defined in the Plan. Therefore, we must determine the meaning of the phrase in the context of a group health policy. Our analysis is governed by the well-established principles of policy interpretation.

■ To resolve a question of policy interpretation, the court performs an independent review, looking first to the language of the insurance policy in order to ascertain its plain meaning as a layperson would understand it. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The court is guided by the principle that the provisions of an insurance policy must be "construed within the context of the policy as a whole." (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1191

inapposite. In that case, a group health insurer cancelled the master policy without notice to an employee and continued to collect premiums. The Illinois appellate court held that the employee had "a vested interest in that policy at least to the extent that he cannot be divested without notice." (*Id.* at p. 736.) The case at bar is distinguishable because Prudential did not cancel the master policy for William's employer.

[77 Cal.Rptr.2d 537, 959 P.2d 1213].) The plain meaning of a policy provision governs, and an insured's reasonable expectations are not considered except where the policy provisions are ambiguous. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265].) The opinions of claims adjusters or other agents or employees of the insurer are also inadmissible to interpret an insurance contract. (*Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 865 [13 Cal.Rptr.2d 318].)

 An insurance policy is considered ambiguous when its terms are capable of two or more constructions, both of which are reasonable. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) " '[L]*anguage in a contract must be construed in the context of that instrument as a whole, and . . . cannot be found to be ambiguous in the abstract.*' " (*Ibid.,* quoting *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Additionally, the court may not "engage in strained or tortured interpretation of the terms of an insurance contract in order to fabricate an ambiguity where none exist[s]." (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 820 [44 Cal.Rptr.2d 56].)

3. *The Plain Meaning of "Enrolled as a Full-Time Student in a School"*

While no California case has interpreted the phrase "enrolled as a full-time student in a school" in the context of a group health policy's provision for dependents coverage, the issue has arisen in other jurisdictions. A leading case is *Margie Bridals, Inc. v. Mutual Benefit Life* (1978) 62 Ill.App.3d 542 [19 Ill.Dec 547, 379 N.E.2d 62, 63] (*Margie Bridals*), in which the Illinois State Appellate Court reviewed a group health policy that provided dependents coverage to "[e]ach unmarried child of the person insured who has reached his nineteenth birthday but has not reached his twenty-fourth birthday who is a full-time student in an accredited school." (*Id.* at p. 64.) The court in *Margie Bridals* determined that "[w]hile the term 'full-time student' is not defined by the policy, the term must be given its usual interpretation. Such term envisions a person's enrollment in an academic institution and attendance at classes on a substantial basis. Full-time ordinarily signifies the normal or standard period of time spent in a named activity." (*Id.* at p. 65.) Applying this interpretation, the court in *Margie Bridals* concluded that because a dependent's "withdrawal from classes and leave of absence from the university cannot be considered in keeping with the activities of a 'full-time student,' " the defendant group health insurer had no obligation to provide medical coverage to that dependent. (*Ibid.*)

Numerous decisions agree with the ruling in *Margie Bridals* that the ordinary, unambiguous meaning of the phrase "full-time student" in a group health policy is attendance at classes on a substantial basis. (See, e.g., *Miller v. Universal Bearings, Inc.* (N.D.Ind. 1995) 876 F.Supp. 1038, 1043 [dependent not a full-time student because fall semester had ended and she had not registered for spring semester]; *Imerson v. District School Bd. of Pasco County* (M.D.Fla. 1993) 818 F.Supp. 1500, 1503 [dependent not a full-time student where dependent admitted but not yet registered to attend classes]; *Blue Cross & Blue Shield of Fla. v. Cassady* (Fla.Dist.Ct.App. 1986) 496 So.2d 875, 877 [same]; *Klotz v. Anthem Life Ins. Co.* (Fla.Dist.Ct.App. 1992) 601 So.2d 593, 594 [student on medical leave is not a full-time student]; *Klein v. Empire Blue Cross & Blue Shield* (1991) 173 A.D.2d 1006 [569 N.Y.S.2d 838, 842] [reasonable meaning of "full-time attendance at college" is attending classes].) A question of fact may arise as to whether the dependent's course load is sufficiently substantial to be considered "full-time." (See, e.g., *Baker v. United Olympic Life Ins. Co.* (Fla.Dist.Ct.App. 1993) 616 So.2d 1163, 1164 [question of fact where de facto attendance exceeded hours of enrollment].) Also, some courts have found ambiguity on that basis. (See, e.g., *Collier v. MD-Individual Practice* (1992) 327 Md. 1 [607 A.2d 537, 540] ["full-time" is ambiguous as to the course load required]; *Massey v. Board of Trustees* (La.Ct.App. 1986) 500 So.2d 864, 865 [ambiguity as to whether policy incorporated college's definition of "full-time" as 12-hour course load].)

The meaning of the terms "enrollment" or "enrolled" in the context of dependents coverage in a group health policy also has been addressed by the courts of other jurisdictions. Applying Webster's Ninth New Collegiate Dictionary's definition, one court has determined that "we read enrollment to mean 'to register.'" (*Nerness v. Christian Fidelity Life Ins. Co.* (La.Ct.App. 1999) 733 So.2d 146, 152; see also *Imerson v. District School Bd. of Pasco County, supra,* 818 F.Supp. at p. 1503.)

### 4. *Michelle Was Not a Qualified Dependent at the Time of Her Accident*

We find persuasive those decisions that have determined that the plain meaning of "enrolled" is "to register" and that the plain meaning of "full-time student" is "attending classes on a substantial basis." Because these decisions rely upon the plain meaning of the words in the insurance policy, they are consistent with the teaching of our Supreme Court in *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at page 18, that a court looks first to the language of the policy in order to ascertain its plain meaning as a layperson would understand it. We therefore find that the plain and

unambiguous meaning of the phrase "enrolled as a full-time student in a school," in the context of the Plan's qualified dependents coverage, is that the dependent is registered in a school and attending classes on a substantial basis. Since it is undisputed that Michelle was not registered at UCSB and was not attending any classes at the time of her accident, as a matter of law Michelle did not meet the definition of "full-time student enrolled in a school" *and did not satisfy that requirement for qualified dependents coverage under the Plan.*

Michelle argues, contrary to our conclusion, that the phrase "enrolled as a full-time student in a school" is ambiguous because it is capable of more than one construction. Michelle finds an additional construction in Prudential's internal documents, which she asserts contain an in-house definition for "enrolled as a full-time student in a school" of pursuing a program of study as a principal activity. Michelle argues that this ambiguity creates a reasonable expectation that a dependent will be covered under the qualified dependents provision of the Plan as long as the student, like Michelle, is on a "de facto approved leave" and intends to return to college during the next quarter.

Based on the principles of insurance contract interpretation and the persuasive decisions of other courts, we cannot agree that the phrase "enrolled as a full-time student in a school" is ambiguous. As we have discussed, to be "enrolled as a full-time student in a school" plainly means that the dependent is registered in a school and attending classes on a substantial basis. The phrase is not subject to another construction without engaging "in strained or tortured interpretation of the terms of an insurance contract in order to fabricate an ambiguity." (*Lunardi v. Great-West Life Assurance Co., supra,* 37 Cal.App.4th at p. 820.) Further, in the present case no question of fact can arise as to whether Michelle was a "full-time student" with respect to her course load, because Michelle was not taking *any* classes at the time of her accident.

Michelle contends that her stated intent to return to UCSB after a quarter's break is sufficient to satisfy the definition of "enrolled as a full-time student" in the context of the Plan. We disagree. A mere intent to return to school is insufficient to qualify a dependent as a full-time student. (*Collier v. MD-Individual Practice, supra,* 607 A.2d at p. 540 ["Dependent children cannot be full-time students if they have withdrawn from the institution, are not attending classes, have not taken examinations, and are not enrolled for upcoming classes, even if there is evidence of an intent to re-enroll."]; *Blue Cross & Blue Shield of Fla. v. Cassady, supra,* 496 So.2d at p. 876 [dependent who had paid college application fee with intention of enrolling did not

qualify as full-time student]; *Colonial Life Ins. Co. v. Hazelton* (Tex.App. 1986) 711 S.W.2d 305, 306 [intent to enroll again after quitting midsemester is not sufficient evidence that dependent is a full-time student].)

The trial court found that triable questions of fact existed as to whether Michelle was a full-time student at the time of her accident, based on plaintiff's additional fact Nos. 4 through 11 and 33 through 56. Fact Nos. 4 through 11 state the following. "4. Michelle completed her freshman year at UCSB in the spring of 1994. [¶] 5. During the summer before the Fall of 1994, Michelle was planning on attending Fall Quarter classes. [¶] 6. Shortly before the 1994 Fall Quarter classes were to begin, Michelle decided not to attend classes during the fall of 1994. [¶] 7. Michelle decided not to attend 1994 Fall Quarter classes determining that she needed to better to [*sic*] earn money to better fund her college education and to focus on personal problems. [¶] 8. Michelle made her decision to take this leave from class attendance with the advise [*sic*] of her college counselor. [¶] 9. Michelle Dunniway was [a] student at UCSB, according to the policies applicable at the time of her accident. [¶] 10. At the time of her accident, Michelle was on approved leave and remained in 'good standing' with the University. She had followed the necessary procedures to take time off from classes and still preserve a spot in the class in the upcoming Winter Quarter, and could return to her classes in the Winter Quarter without reapplying for admission to UCSB. [¶] 11. During her short stay away from classes in the fall of 1994, Michelle always planned on attending UCSB classes during the Winter Quarter of 1994."

As evidence supporting these facts, Michelle cites the deposition testimony and declaration of her mother and the declaration of UCSB associate registrar Virginia Johns (Johns), paragraphs 4 and 8.[7] Our review shows that there is no evidence to support fact number 10, that Michelle was a student in good standing who could return to UCSB without applying for readmission. Only the declaration of Johns is cited to support that fact. The declaration states at paragraph 4 that Michelle was eligible to register for the 1994-1995 academic year as an undergraduate student. At paragraph 8 the declaration states, "Approximately 61% to 68% of our undergraduates take at least one extra quarter over the usual 12 quarters of study to complete their undergraduate degree requirements. In fact, undergraduates may be absent from UCSB for one or more quarters at the conclusion of any quarter without petitioning for withdrawal, provided no fees have been paid for the

---

[7]The record reflects that this declaration was filed in support of plaintiff's motion for summary adjudication and referenced by plaintiff in her opposition to Prudential's motion for summary judgment.

following quarter. Petitioning for withdrawal is only required if 1) withdrawal is during a quarter, 2) a refund of fees is requested, or 3) the student has signed a deferred payment agreement with the UCSB Billing Office. A UCSB student, in good standing, who cancels registration or withdraws from classes for a quarter is eligible to resume classes the following quarter without reapplying for admission."

It is apparent that the Johns declaration does not support plaintiff's fact No. 10. The declaration only states the general UCSB rule that students in good standing are allowed to take a quarter off and return to school without applying for readmission. No evidence is provided in the declaration or in support of fact Nos. 4 through 9 and 11, which contradicts Prudential's evidence showing that Michelle had canceled her registration for fall quarter, was not attending any classes at the time of her accident, and was required by UCSB to apply for readmission to winter quarter.

Nor do additional fact Nos. 33-56 in plaintiff's separate statement of facts create a triable question of material fact. Collectively, these facts state that Michelle and her parents believed that she was still enrolled as a full-time student in fall 1994; that UCSB does not require continuous attendance for a student to be considered full-time; that most UCSB students take one extra quarter to graduate; that Prudential left it to the parents, the dependent, and the educational institution to define "full-time student"; that Prudential's internal policy was to cover students on reasonable breaks; and that Prudential employees testified that Prudential has covered dependents not attending classes as long as they were full-time students at the time they submitted the overage student verification form to Prudential.

For several reasons, we find that no triable questions of material fact are created by plaintiff's evidence in support of additional fact Nos. 33 through 56. ■ First, "[a] party's subjective intent cannot be used to create an ambiguity or a material factual issue." (*Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 661 [68 Cal.Rptr.2d 487].) Therefore, it is irrelevant whether Michelle and her parents subjectively believed that she remained a full-time student even though she had canceled her registration at UCSB and was not attending classes. ■ Similarly, "[w]here a policy provision has a 'plain meaning', it is immaterial that the insurer's agents, employees or other representatives have misinterpreted that meaning," because " '[o]pinion evidence *is completely inadmissible to interpret an insurance contract.*' " (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 4:17.5, p. 4-6; *Chatton v. National Union Fire Ins. Co., supra,* 10 Cal.App.4th at p. 865.) Thus, it is immaterial

that Prudential's employees have admitted that dependents' coverage has been provided to dependents who did not qualify as full-time students within the plain meaning of the term.

Nor does any evidence concerning UCSB's internal definition of the term "full-time student" create a triable question of material fact as to Michelle's student status. The argument that a university's definition of "full-time student" should be incorporated into an insurance policy was rejected in *Collier v. MD-Individual Practice, supra,* 607 A.2d at pages 539-540. The court ruled that the plain meaning rule governed and thus the question was " '[w]hat is the customary and normal meaning of "full-time student" in the context of a group health insurance policy?' " (*Id.* at p. 539.)

Michelle's argument that a triable question of fact exists as to whether she remained a full-time student during her short "approved leave" from UCSB is similarly unpersuasive. Courts have rejected the argument that a dependent remains a full-time student while on a leave of absence. (*Margie Bridals, supra,* 379 N.E.2d at p. 65 [leave of absence not in keeping with activities of full-time student].) The only exception is when a full-time registered student withdraws from school on a medical leave of absence due to a health problem which prevents attendance at school. In that situation, the insurer cannot deny dependents medical coverage for the health problem on grounds that the student is no longer a full-time student. (*Nerness v. Christian Fidelity Life Ins. Co., supra,* 733 So.2d at p. 153; *Klotz v. Anthem Life Ins. Co., supra,* 601 So.2d at p. 594.)

Nor does Michelle's comparison of her absence from college during the fall quarter to a student's absence during summer vacation create a triable material question of fact as to whether she was a full-time student. Insurers provide dependents coverage to full-time students during summer vacation because "[it] is common knowledge that customarily schools recess for the summer months." (*Blue Cross & Blue Shield of Fla. v. Cassady, supra,* 496 So.2d at p. 877.) Michelle's comparison is not apt because her accident occurred during UCSB's fall quarter, not during summer vacation.

For these reasons, we are not persuaded by Michelle's arguments. We must conclude as a matter of law that, on the date of her accident, Michelle was not eligible for qualified dependents coverage under the Plan because it cannot be disputed that she was not enrolled as a full-time student in a school. Since Michelle was not an insured under the Plan on the day of her accident, she did not meet the threshold requirement for a vested right to lifetime benefits for medical expenses arising from her injuries. Accordingly, we further conclude that Prudential did not breach the group health

insurance contract set forth in the Plan when it denied medical benefits to Michelle for accident-related medical expenses incurred after August 31, 1996. The first cause of action for breach of contract therefore lacks merit as a matter of law.

As a consequence of these conclusions, we must further rule that the second cause of action for a declaration that Prudential is obligated to pay Michelle's claim for ongoing medical benefits also lacks merit as a matter of law. Finally, we conclude as a matter of law that the third cause of action for breach of the covenant of good faith and fair dealing also lacks merit. To establish breach of the covenant of good faith and fair dealing, the insured must prove that benefits due under the policy have been withheld unreasonably or without proper cause. (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151 [271 Cal.Rptr. 246].) As we have determined, Prudential has not withheld any medical benefits which were owed to Michelle under the Plan. Therefore, as a matter of law Prudential has no liability for breach of the covenant of good faith and fair dealing.

Having concluded that Prudential is entitled to summary judgment because all causes of action in Michelle's complaint lack merit as a matter of law, we need not consider Prudential's alternative contention that it is entitled to summary judgment on the ground that it is not a party to the Plan.

## IV. DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order denying the motion for summary judgment of defendants Prudential Insurance Company of America, Inc., and Prudential Health Care Plan of California, Inc., and to enter a new order granting the motion. The temporary stay order is vacated. Each party is to bear its own costs in this original proceeding.

Bamattre-Manoukian, Acting P. J., and Premo, J., concurred.